Cite as 2024 Ark. 37

# SUPREME COURT OF ARKANSAS

**No.** CV–23–349

| | |
|---|---|
| FLOYD E. SAGELY, JR.<br><br>APPELLANT<br><br><br>V.<br><br><br><br>ASA HUTCHINSON, GOVERNOR OF ARKANSAS; COLONEL WILLIAM J. BRYANT, DIRECTOR OF THE ARKANSAS STATE POLICE; AND BRAD CAZORT, DIRECTOR OF THE ARKANSAS CRIME INFORMATION CENTER, IN THEIR OFFICIAL CAPACITIES<br><br>APPELLEES | **Opinion Delivered:** March 28, 2024<br><br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-20-2730]<br><br>HONORABLE CARA CONNORS, JUDGE<br><br><br>AFFIRMED. |

**BARBARA W. WEBB, Justice**

Appellant Floyd Sagely appeals the Pulaski County Circuit Court's order dismissing his equal-protection claim with prejudice against appellees Arkansas Governor Asa Hutchinson, Arkansas Crime Information Center (ACIC) Director Brad Cazort, and Arkansas State Police Director Colonel William Bryant, in their official capacities. For reversal, Sagely argues that Arkansas Code Annotated section 5-73-103 (Repl. 2016) is unconstitutional under both *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) and the Equal Protection Clause of the Fourteenth Amendment. In addition, Sagely argues that the circuit court erred in dismissing the State of Arkansas and Arkansas Attorney General Leslie Rutledge as parties. We affirm.[1]

---

[1]The *majority* of this court votes to affirm the circuit court's order.

## I. *Background*

In 2010, a petition to involuntarily commit Sagely was filed by his wife. The Sebastian County Circuit Court held a hearing on the petition and heard testimony that Sagely was paranoid, delusional, believed people were watching him, believed his home and work had been "bugged" and tore apart household appliances to find hidden cameras, was sleep deprived, drank and carried what appeared to be crystal meth, saw images not visible to others, carried loaded guns with him, shot a bullet through the floorboard of his truck, and shot a bullet through the ceiling of his home because he believed something was in the attic. The State also admitted a medical evaluation of Sagely, which recommended his commitment to a treatment facility. Based on the testimony and the medical evaluation, the circuit court found that Sagely posed a clear and present danger to himself and others. Sagely was thus involuntarily committed to a mental health treatment facility for up to forty-five days under Arkansas Code Annotated sections 20-47-201 et seq.

On May 15, 2019, Sagely was stopped for a traffic violation in Little River County. The officer performed a routine ACIC check, which revealed that Sagely had been "involuntarily committed." Because Sagely possessed a firearm in his car, he was charged with a Class A misdemeanor under Arkansas Code Annotated section 5-73-103, which prohibits a person who has been "committed involuntarily to any mental institution" from possessing or owning a firearm. Sagely accepted a plea bargain and paid a fine and costs with credit for "time served."

On April 22, 2020, Sagely filed a complaint for declaratory judgment and injunctive relief against the State of Arkansas, Attorney General Leslie Rutledge, Arkansas State Police Director William Bryant, and the ACIC. He sought relief from the statutory prohibition

preventing him from owning or possessing a firearm. Sagely later amended his complaint to add Governor Asa Hutchinson and ACIC Director Brad Cazort.

Sagely asserted that Arkansas Code Annotated sections 5-73-103 and 5-73-309, which govern who may own and possess a firearm in Arkansas, do not apply to him because he was involuntarily "admitted" to a treatment facility and not "committed." If sections 5-73-103 and 5-73-309 did apply to him, Sagely contended, these statutes violated equal protection by allowing felons to petition to have their gun rights reinstated but does not allow those who were involuntarily committed to a mental health facility to have their gun rights reinstated. In addition, Sagely argued Arkansas Code Annotated sections 20-47-201 et seq. (Repl. 2018 & Supp. 2023), which sets forth the statutory framework for involuntarily committing a person, violates due process. In sum, he sought a declaration that he is legally entitled to own and possess a firearm under Arkansas law. Sagely also sought an injunction against the ACIC obliging it to disregard his 2010 adjudication of mental illness.

Appellees moved to dismiss Sagely's complaint for improper service and failure to state facts upon which relief could be granted. The circuit court dismissed all claims against the State of Arkansas and the Attorney General.[2] The circuit court also dismissed all but Sagely's equal-protection claim.

Sagely subsequently moved for judgment on the pleadings or, alternatively, summary judgment on his remaining equal-protection claim. He argued that section 5-73-103 was subject to intermediate scrutiny, and under such review, the statute violated his equal-

---

[2]Both parties claim that the circuit court dismissed the Governor as a party; however, this is not reflected in either the circuit court's order or elsewhere in the record. Consequently, the Governor remains a party for the purposes of this appeal.

protection rights because no legitimate state interest is furthered by treating felons and persons previously committed to a mental health facility differently. Appellees responded, asserting entitlement to judgment as a matter of law. They argued that Sagely could not prevail under an equal-protection analysis since he is not similarly situated to persons adjudicated as felons. Further, appellees contended Sagely's claim was subject to rational-basis review, and even if intermediate scrutiny applied, section 5-73-103 should be upheld because the State has a legitimate interest in public safety, which is furthered by prohibiting individuals that have been involuntarily committed from possessing firearms.

The circuit court held Sagely's motion for judgment on the pleadings and appellees' cross-motion in abeyance pending the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*. The circuit court did so because the parties differed on the appropriate level of scrutiny to be applied to Sagely's equal-protection claim in the context of gun ownership rights under the Second Amendment to the United States Constitution, and one issue raised in *Bruen* was the appropriate level of scrutiny in Second Amendment cases.

The Supreme Court ultimately held in *Bruen* that when courts review the validity of a firearm restriction under the Second Amendment, the government must demonstrate that such restriction is consistent with the nation's historical tradition of firearm regulation. *Id.* at 17. In consideration of the *Bruen* decision, the circuit court ordered supplemental briefing from the parties. Sagely argued in his supplemental brief that section 5-73-103 fails under *Bruen* because Arkansas did not have any laws prohibiting those involuntarily committed to a mental facility from possessing or owning a firearm until 1976. Appellees argued in

4

response that section 5-73-103 is presumptively lawful under the Second Amendment and, alternatively, historical evidence supports restrictions on the mentally ill.

Following a hearing, the circuit court entered an order denying Sagely's motion for judgment on the pleadings and granting appellees' cross-motion for judgment on the pleadings. The circuit court rejected Sagely's equal-protection claim, finding that persons who have been involuntarily committed due to mental illness are not similarly situated to those who have been convicted of a felony offense. Accordingly, the circuit court dismissed Sagely's complaint with prejudice. This appeal followed.

## II. *Discussion*

A motion for judgment on the pleadings is appropriate if the pleadings show on their face that there is no merit to the suit. *Monsanto Co. v. Ark. State Plant Bd.*, 2021 Ark. 103, at 5, 622 S.W.3d 166, 170. When we review the granting of judgment on the pleadings, we view the facts alleged in the complaint as true and in the light most favorable to the party seeking relief. *Id.* We will affirm the circuit court's decision in the absence of an abuse of discretion. *Id.* However, issues of law, such as the constitutionality of a statute, are reviewed de novo. *See Landers v. Stone*, 2016 Ark. 272, at 5, 496 S.W.3d 370, 375.

On appeal, Sagely argues that section 5-73-103 is unconstitutional under *Bruen* because there is no historical tradition of prohibiting those committed to a mental health facility from possessing firearms. Further, he contends section 5-73-103 is unconstitutional under the Equal Protection Clause by treating felons and persons adjudicated mentally ill

5

differently. Sagely also argues that the circuit court erred in dismissing the State of Arkansas and the Arkansas Attorney General as parties.[3]

## A. Standing

Before reaching these arguments, we first address appellees' threshold contention that Sagely lacks standing to challenge the constitutionality of section 5-73-103. Appellees assert that federal law also prevents Sagely from owning or possessing a firearm; thus, even if he obtains a favorable ruling in this case, Sagely would still not be entitled to the relief he seeks––restoration of his Second Amendment rights.[4]

The general rule is that one must have suffered injury or belong to a class that is prejudiced to have standing to challenge the constitutional validity of a law. *Ark. Tobacco Control Bd. v. Sitton*, 357 Ark. 357, 363, 166 S.W.3d 550, 554 (2004). Stated differently, a plaintiff must show that the questioned act has a prejudicial impact on him or her. *Tauber v. State*, 324 Ark. 47, 49, 919 S.W.2d 196, 197 (1996).

Sagely has plainly been prejudiced by section 5-73-103 because it currently prohibits him from possessing a firearm. And because he pled guilty to misdemeanor possession in 2019, Sagely is now subject to felony prosecution under Arkansas law should he be arrested again for possessing a firearm. Ark. Code Ann. § 5-73-103(c)(1)(C) (Supp. 2023). Whether Sagely is also barred under federal law from possessing a firearm is not an issue before this

---

[3]There are two dissenting opinions in this case. This opinion responds to Justice Wood's dissent throughout the analysis section.

[4]18 U.S.C. § 922(g)(4) bars any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing "any firearm or ammunition."

6

court. Accordingly, we conclude Sagely had standing to bring this declaratory action and we proceed to the merits of his appeal.

## B.  *Bruen*

For his first point on appeal, Sagely argues that section 5-73-103 is unconstitutional under *Bruen*. In response, appellees contend statutory restrictions on mentally ill persons from owning or possessing firearms are presumptively constitutional under *Bruen*. We agree.

At issue in this appeal is whether equal protection entitles Sagely to a process to restore his gun rights under the Second Amendment. In his complaint, Sagely specifically couched his equal-protection claim in terms of vindicating his Second Amendment right. Thereafter, the circuit court held proceedings in abeyance pending the Court's decision in *Bruen* because the parties differed "on the appropriate level of scrutiny that the court should apply to plaintiff's equal protection claim in the context of gun ownership rights under the Second Amendment." Following the Court's decision in *Bruen*, the parties litigated whether the standard set forth in that case rendered section 5-73-103 in violation of the Second Amendment. Sagely's equal-protection claim is thus intertwined with the Second Amendment, and his present argument cannot be viewed as a separate and distinct claim. We therefore proceed to the merits of Sagely's argument under *Bruen*. The parameters of the Second Amendment right have been shaped by a line of recent cases decided by the Supreme Court. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court held for the first time that the Second Amendment guarantees the individual right to possess and carry firearms for traditionally lawful purposes, such as self-defense within the home. Writing for the majority, Justice Scalia qualified the Court's holding, noting that "the right secured by the Second Amendment is not unlimited" and that nothing in its "opinion

should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626. Shortly thereafter, the Court held in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), that the Second Amendment is fully applicable to the states. Importantly, the Court reaffirmed *Heller*'s holding that the Second Amendment right is not absolute. *Id.* at 787.

*Bruen* is the Court's most recent Second Amendment case. As discussed, the Court held that for a firearm restriction to be upheld, the government must demonstrate that the restriction is consistent with the nation's historical tradition of firearm regulation. *Id.* at 17. The Court also reiterated that the Second Amendment right to keep and bear arms is not unlimited. *Id.* at 21. And, in his concurrence joined by Chief Justice Roberts, Justice Kavanaugh further emphasized that "as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 80 (Kavanaugh, J., concurring). Justice Kavanaugh continued, quoting approvingly from *Heller*'s disclaimer that the decision should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 81 (quoting *Heller*, 554 U.S. at 626). In three successive decisions, the Court has taken pains to underscore that firearm restrictions on the mentally ill fall squarely within our nation's historical tradition. Despite the dissent's best efforts to create qualification where none exists, the Court simply did not distinguish permanent and temporary restrictions on the mentally ill. Accordingly, we conclude that section 5-73-103 is presumptively constitutional under Supreme Court precedent.[5]

---

[5]The dissent suggests that the relevant inquiry when evaluating gun restrictions is the dangerousness an individual poses. In her view, an individual who, decades earlier, "was

## C. Equal Protection Clause

Sagely next argues that section 5-73-103 violates equal protection by treating felons and persons adjudicated mentally ill differently. Specifically, he avers that under Arkansas law, felons are provided a path to restore their gun rights while persons like himself, who have been committed to a mental health facility, are permanently barred from owning or possessing a firearm.[6]

Equal protection generally requires the government to treat similarly situated people alike. *Brown v. State*, 2015 Ark. 16, at 6, 454 S.W.3d 226, 231 (citing *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)). Thus, the first step in an equal-protection analysis is to determine whether the plaintiff has demonstrated that he was treated differently than others who were similarly situated. *Id.* at 7, 454 S.W.3d at 231.

Sagely's equal protection claim fails because he cannot demonstrate that he and persons convicted of a felony offense are similarly situated. We have specifically held that civil litigants such as Sagely are not similarly situated to criminal defendants for equal-protection purposes. *See McDole v. State*, 339 Ark. 391, 401, 6 S.W.3d 74, 81 (1990).[7] And

---

involuntarily committed for thirty days for depression following a painful divorce does not necessarily pose a special danger today." In reaching this position, the dissent relies on a Sixth Circuit decision that is distinct from the facts in the present case. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2015). Whether an individual remains a danger to himself or others is a policy determination left to the General Assembly, not this court. *See, e.g., Kerr v. East Cent. Ark. Reg'l Housing Auth.*, 208 Ark. 625, 630, 187 S.W.2d 189, 192 (1945); *Benton Sch. Dist. v. Greer*, 2023 Ark. 160, at 9, 677 S.W.3d 799, 804.

[6]We note that persons who have been involuntarily committed may have their gun rights restored under Arkansas law if the United States Attorney General approves an application to remove federal restrictions. *See* Ark. Code Ann. § 5-73-103(a); *see also* 18 U.S.C. § 925(c). There is no indication that Sagely availed himself of this option.

[7]In *McDole*, the appellant's equal-protection claim pertained to discovery. While factually distinguishable from the present case, this has no bearing on *McDole*'s holding that

in *Addington v. Texas*, the Supreme Court held, in the context of a Due Process Clause challenge, that "a civil commitment proceeding can in no sense be equated to a criminal prosecution." 441 U.S. 418, 428 (1979). Civil commitment involves a loss of liberty, but rather than imposing a punitive sentence upon criminal conviction, the civil commitment process provides for release once the individual is no longer deemed a danger to others. *See United States v. O'Laughlin*, 934 F.3d 840, 841 (8th Cir. 2019) (citing *Addington*, 441 U.S. at 428). Moreover, under Arkansas law, only felons convicted of non-gun-related and nonviolent crimes may have their gun rights restored.[8] Meanwhile, Sagely's involuntary commitment was based on his dangerous and reckless use of a firearm.[9] The circuit court therefore correctly rejected Sagely's equal-protection claim.[10]

---

"[w]hile both criminal and civil defendants may be called litigants, they are far from similarly situated." 339 Ark. at 401, 6 S.W.3d at 81.

[8]The governor may restore a felon's gun rights upon the recommendation of local law enforcement so long as the underlying felony "did not involve the use of a weapon." Ark. Code Ann. § 5-73-103(d). A person is not subject to the firearm restriction of section 5-73-103 if that person's case was dismissed and expunged under sections 16-93-301 et seq. (Repl. 2016 & Supp. 2023) or section 16-98-303(g) (Supp. 2023). Ark. Code Ann. § 5-73-103(b)(2). Under sections 16-93-301 et seq., a first-time offender may have his or her record sealed so long as the person is not found guilty of a felony involving violence. *See* Ark. Code Ann. § 16-93-303(a)(1)(B)(vi). And section 16-93-303 allows drug-court participants to have their records sealed. Ark. Code Ann. § 16-98-303(g).

[9]To commit Sagely, the circuit court was required to make a finding that he "is of danger to himself [] or to others." Ark. Code Ann. § 20-47-214(b)(2) (Repl 2018). Sagely was a danger to himself or others if his behavior demonstrated he lacked the capacity to care for his "own welfare that there is a reasonable probability of death, serious bodily injury or serious physical or mental debilitation if admission is not ordered." Ark. Code Ann. § 20-47-207(c)(2)(C) (Repl. 2018).

The circuit court entered its order for involuntary admission of Sagely, finding him mentally ill and that he "pose[d] a clear and present danger to himself or others."

[10]The dissenting justice would find in favor of Sagely's claim. However, she attempts to shirk responsibility for her position by stating she would stay an order invalidating section 5-73-103 "for 120 days to give the General Assembly an opportunity to create the process"

## D. Proper Parties

Last, Sagely argues that the circuit court erred in dismissing the State of Arkansas and the Arkansas Attorney General as parties. He contends that joinder was necessary pursuant to Arkansas Rule of Civil Procedure 19 and Arkansas Code Annotated section 16-111-111 (Supp. 2023). Because we conclude that Sagely's constitutional claims fail as a matter of law, this point is moot, and we decline to address it. *See, e.g.*, *Steinbuch v. Univ. of Ark.*, 2019 Ark. 356, at 20, 589 S.W.3d 350, 362 ("We will not review moot issues, as doing so would be to render an advisory opinion, which we will not do.").

We conclude that the circuit court did not abuse its discretion by granting judgment on the pleadings in favor of appellees and determining that section 5-73-103 is not unconstitutional. Accordingly, we affirm.

Affirmed.

KEMP, C.J., concurring.

WOOD, WOMACK, and HILAND, JJ., dissenting.

**JOHN DAN KEMP, Chief Justice, concurring.** I agree with the majority opinion that Sagely has standing to bring this declaratory action. However, while I concur with the majority's decision to affirm on the remaining arguments, I do not agree with the majority opinion's rationale and write separately to set forth my analysis of *New York State Rifle &*

---

to restore Sagely's gun rights. The dissenting justice's act of judicial fiat ignores the Arkansas Constitution, which provides that only the governor may call the General Assembly into special session. Ark. Const. art. 6, § 19. If a statute is invalid, we must not shy away from declaring it so. However, to have this court dictate to the legislature that it enact a certain amendment to current law offends the principle of separation of powers.

*Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and Sagely's equal-protection claim. Respectfully, I concur in the judgment.

## I. *Relevant Facts*

In Sagely's second amended complaint for declaratory judgment and injunction, Sagely requested the following relief:

> A declaration that A.C.A. §§ 5-73-103 and 5-73-309 violate Equal Protection by placing "admittees" under permanent disability, while "convicted felons" may have their disabilities removed by the Governor, via pardon or at the recommendation of a local law enforcement officer.

Subsequently, in his motion for summary judgment, Sagely asserted,

> Arkansas by statute has created a prohibition against felons and former mental patients having firearm rights. It can be "rational" to limit both groups from owning or possessing firearms. Arkansas impermissibly discriminates *between* the two groups (felons and persons who once exhibited mental illness symptoms), by offering the former group numerous ways to regain their rights, but not the latter. This *subclassification* violates the Equal Protection clause.

(Emphasis in original.) In the prayer for relief, Sagely asked "for a Declaration, on the pleadings or on Summary Judgment, that Ark. Code Ann. § 5-73-103 is unconstitutional as applied to persons like Plaintiff, or, if interpreted correctly, does not [bar] a person like the Plaintiff, sent for temporary observation to a mental health facility, from ever owning or possessing a [firearm] under Arkansas law."[1]

---

[1]Arkansas Code Annotated section 5-73-103(a) (Repl. 2016) provides,

(a) Except as provided in subsection (d) of this section or unless authorized by and subject to such conditions as prescribed by the Governor, or his or her designee, or the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives, or other bureau or office designated by the United States Department of Justice, no person shall possess or own any firearm who has been:

(1) Convicted of a felony;

(2) Adjudicated mentally ill; or

Ultimately, after conducting a hearing on the matter, the circuit court took the case under advisement and examined *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (reviewing New York's concealed-carry statute requiring an applicant to demonstrate cause to obtain a license and setting forth a new test to determine whether the statute, which potentially deprives a person of his or her Second Amendment rights, is consistent with this country's historical tradition of firearm regulation). On February 3, 2023, the circuit court denied Sagely's motion for judgment on the pleadings and granted appellees' cross-motion. Specifically, the circuit court found that Sagely's "remaining equal protection claim, arguing that Ark. Code Ann. §§ 5-73-103 and 5-73-309 violate the Fourteenth Amendment as it applies to [Sagely] and individuals who have been adjudicated mentally ill or involuntarily committed to a mental health institution[,] [was] hereby DISMISSED WITH PREJUDICE." The circuit court further found "that such individuals are NOT similarly situated as individuals who have been previously convicted of a felony offense." Sagely appealed.

## II. Bruen *and the Second Amendment*

For the following reasons, I disagree with the majority's analysis of *Bruen*, 597 U.S. 1. The Second Amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It is well-established that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Supreme Court stated this right

---

(3) Committed involuntarily to any mental institution.

13

can be subject to certain restrictions, including those "longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id*. The Court further stated that the Second Amendment protects "the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." *Id*. at 635 (emphasis added). The Court added that "nothing in our opinion should be taken to cast doubt on *longstanding prohibitions on the possession of firearms by . . . the mentally ill*[.]" *Id*. at 626 (emphasis added).

Relying on *Heller*, 554 U.S. 570, the *Bruen* court implemented the "text-and-history standard [as] a two-part inquiry[,]" as follows:

> The first inquiry is: Does the plain text of the second amendment cover an individual's conduct? If not, the regulation is constitutional because it falls outside the scope of protection. But if it does, the individual's conduct is presumptively protected by the second amendment, and we move to the second inquiry: Is the State's regulation consistent with the Nation's historical tradition of firearm regulation[?]

*Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 2024 IL App. (3d) 210073, ¶ 13.

Under the *Bruen* test, the first inquiry is whether the plain text of the Second Amendment covers Sagely's conduct. In my view, the answer is no. "Scholarship suggests historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible." *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011). To illustrate, in a case involving a convicted felon, a federal district court emphasized that because "the qualifier 'law-abiding' [was used] when discussing 'the people' in the context of the Second Amendment, [the defendant's] conduct [was] not covered by the Second Amendment[,]" and he was "not part of 'the people' whose conduct [was] privileged under the Constitution[.]" *United States v. Harris*, No. 21-00247, 2024 WL 969702 (W.D. La. Mar. 6, 2024); *see also United States v. Rahimi*, 61 F.4th 443, 451 (5th

14

Cir. 2023) (employing the same test). Likewise, in this instance, Sagely's conduct is not covered as a "law-abiding, responsible citizen[]," *Heller*, 554 U.S. at 635, or as an "ordinary, law-abiding citizen[]," *Bruen*, 597 U.S. at 9, as he had been involuntarily committed because of violent behavior toward himself and others. Based on this precedent, I conclude that Sagely is excluded from "the people" whose rights are protected under the Second Amendment, and he cannot avail himself of the fundamental right to keep and bear arms protected by the Second Amendment. Therefore, I would reject Sagely's arguments regarding the constitutionality of section 5-73-103 pursuant to the Second Amendment. Because Sagely cannot meet the first prong of the *Bruen* test, it is unnecessary to determine whether the statute is consistent with the historical tradition of firearm regulation.

### III. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause generally requires the government to treat similarly situated people alike. *Brown v. State*, 2015 Ark. 16, at 6, 454 S.W.3d 226, 231 (citing *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)).

Sagely first argues that section 5-73-103 violates his equal-protection rights because persons with mental illness "[who were] involuntarily committed were subject to lifetime bans [to possess or own firearms], while felons were given increasingly liberalized rights." The first step in an equal-protection case is to determine whether Sagely has demonstrated that he was treated differently than others who were similarly situated to him. *Brown*, 2015 Ark. 16, at 6–7, 454 S.W.3d at 231. Here, Sagely has demonstrated that felons and

15

individuals with mental illness are treated differently and are similarly situated because the General Assembly has deemed that the persons in those two groups "shall [not] possess or own any firearm." Ark. Code Ann. § 5-73-103(a). Both convicted felons and persons with mental illness may have their gun rights restored pursuant to 18 U.S.C. § 925(c) and Arkansas Code Annotated section 5-73-103(d), respectively.

But to prove that his mental-illness classification deprives him of equal protection under the law, Sagely must also show that there is no rational basis for this classification. Rational-basis review is required because section 5-73-103 does not implicate a fundamental right or discriminate against a suspect class. *See, e.g.*, *Arnold v. State*, 2011 Ark. 395, at 7–8, 384 S.W.3d 488, 495 (per curiam). Persons with mental illness are not recognized as a suspect class for equal-protection purposes. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 445–46 (1985); *Cospito v. Heckler*, 742 F.2d 72, 83 (3d Cir. 1984) ("[M]ental illness has not been recognized as a suspect class . . . under the equal protection clause."). Nor are felons a protected class. *United States v. McKenzie*, 99 F.3d 813, 817 (7th Cir. 1996). Nor is a fundamental right implicated because, as previously discussed, Sagely's involuntary commitment due to mental illness excludes him from "the people" whose rights are protected under the Second Amendment. Thus, if neither felons nor persons with mental illness are members of a suspect class and their claim does not involve a fundamental right, an Equal Protection claim may still proceed, but it is subject to rational-basis review rather than strict scrutiny. *Am. Family Ins. v. City of Minneapolis*, 836 F.3d 918, 921 (8th Cir. 2016). Under the rational-basis test, the party challenging the constitutionality of the statute must prove that the statute is not rationally related to "achieving any legitimate governmental

16

objective under any reasonably conceivable fact situation." *Talbert v. State*, 367 Ark. 262, 270, 239 S.W.3d 504, 511 (2006).

In the case at bar, Sagely cannot meet the burden of proving that section 5-73-103 is not rationally related to achieving any legitimate governmental interest. Sagely challenges the convicted-felon classification vis-à-vis the mental-illness classification, but the underlying key question is whether section 5-73-103(a)'s classifications bear a rational relationship to a legitimate governmental purpose. They do. First, the statute's classifications are rationally related to a legitimate governmental purpose of protecting its citizenry. Act 74 of 1987, which codified an amendment to section 5-73-103(a), contains an emergency clause that states, "[A]n emergency is hereby declared to exist and this Act being immediately necessary for the preservation of the public peace, health and safety shall be in full force and effect from and after its passage and approval. APPROVED: February 9, 1987."[2] Act 74 of 1987, § 3. Second, the statute's classification of those persons with mental

_____

[2]Section 3 of Act 74 of 1987 also states, "[T]his language is unfairly broad and that a mechanism should be devised whereby persons who constitute no danger to themselves or others should not be restricted for the duration of their lives from owning or possessing firearms[.]" But since the enactment of Act 74 of 1987, the General Assembly *inter alia* enacted Act 63 of the Second Extraordinary Session of 1994, stating in its emergency clause "that many crimes are committed by felons who unlawfully possess firearms and that the penalty for unlawful possession of a firearm by a felon should be increased[.]" Act 63 of 1994, § 5 (2d ex. sess.). Additionally, in Act 595 of 1995, the General Assembly stated in its emergency clause that the intent of the Act was to legislatively overrule *Irvin v. State*, 301 Ark. 416, 784 S.W.2d 763 (1990) (holding that a prior sentence under the Youthful Offender Act could not be used as the underlying felony in a later prosecution for felon in possession of a firearm). Act 595 of 1995, § 5. In fact, the legislature has made numerous amendments to section 5-73-103 and has not seen fit to make any change relating to the classification at issue. *See, e.g., Smith v. U.S. Fidelity & Guaranty Co.*, 239 Ark. 984, 987, 395 S.W.2d 749, 751 (1965). Therefore, I defer to the legislature's purpose of Act 74 of 1987 for "the preservation of the public peace, health[,] and safety[.]"

illness who have been involuntarily committed to a mental-health treatment facility is rationally related to protecting the peace, health, and safety of the public, those persons' families and friends, and the persons themselves during the course of their illness—however long or short.

Because section 5-73-103's classification is rationally related to the legitimate governmental interest of protecting the peace, health, and safety of Arkansas citizens, I would hold that Sagely has not demonstrated a violation of his equal-protection rights, and I would affirm the circuit court's ruling on this basis. Accordingly, I concur in the judgment.

**RHONDA K. WOOD, Justice, dissenting**. Fourteen years ago, Floyd Sagely was involuntarily committed to a mental-health treatment facility for about forty-five days and then released. Because of that commitment, Arkansas law permanently prohibits him from owning or possessing a firearm. There is no process in Arkansas for Sagely to have his rights restored. Before us is not whether Sagely should be able to own or possess a firearm. Rather, it is whether the Equal Protection Clause entitles him to a process by which he may petition to have his firearm rights restored, a process akin to the one the legislature has given felons. Sagely asserts the answer is yes because he is similarly situated to felons, and the State disagrees. The circuit court agreed with the State and denied relief. Sagely appealed.

The majority denies Sagely's equal-protection claim. It emphasizes the facts surrounding the reasons Sagely was first committed, but those are irrelevant to whether the State is required years later to have a process to determine if he remains a danger and still requires his firearm rights restricted. I find (1) felons and formerly involuntarily committed persons are similarly situated in this context; (2) Sagely's challenge implicates a fundamental right, and therefore strict scrutiny applies; and (3) the statute fails strict scrutiny and violates

18

equal protection.[1] Because I would reverse the finding of the circuit court, I respectfully dissent.

Sagely claims that Arkansas Code Annotated section 5-73-103 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This court reviews constitutional challenges to statutes de novo.[2] The Equal Protection Clause prohibits states from denying a person "the equal protections of the laws."[3] It requires that all similarly situated people be treated alike under the law.[4] While the text of the Fourteenth Amendment does not contain the phrase "similarly situated," the Supreme Court of the United States began using this language in 1884. It explained in *Barbier v. Connolly* that "legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose . . . affects alike all persons similarly situated, is not within the amendment."[5] Thus, the first step is to determine whether the law at issue treats *similarly situated* people differently.[6]

---

[1]Sagely did not plead a direct Second Amendment claim, though he initially sought relief under due process and the Equal Protection Clause. (RP 45). On December 23, 2020, the circuit court dismissed all claims, without prejudice, except the equal-protection claim. (RP 180-90). It analyzed *Bruen* only to determine the level of equal-protection scrutiny. (RT 52-61). Sagely did not refile any of the dismissed claims, nor did he appeal that 2020 order. (RP 425-26). We only have his equal protection claim before us.

[2]*Brown v. State*, 2015 Ark. 16, at 6, 454 S.W.3d 226, 231.

[3]U.S. Const. amend. 14, § 1.

[4]*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

[5]*Barbier v. Connolly*, 113 U.S. 27, 32 (1884).

[6]*Brown*, 2015 Ark. 16, at 6–7, 454 S.W.3d at 231.

19

## I.  *Similarly Situated*

Sagely argues that he and other individuals who were involuntarily committed to a mental institution are similarly situated to felons under section 5-73-103 because that law prohibits both groups from owning or possessing a firearm upon their initial adjudication. I would find these two groups are similarly situated because we have considered them similar for other constitutional protections and the State's purpose for regulating their possession of firearms is the same. The statute provides:

> Except as provided in subsection (d) . . . no person shall possess or own any firearm who has been:
> (1) Convicted of a felony;
> (2) Adjudicated mentally ill; or
> (3) Committed involuntarily to any mental institution.[7]

The plurality believes that the groups are not similarly situated because civil and criminal litigants are different. They argue Sagely and those involuntarily committed through a civil process are not similar to those who are criminally convicted. They cite *McDole v. State* for support, yet that case is factually and legally distinguishable.[8] *McDole* was limited to holding that criminal defendants did not have the right to the same discovery rules as civil defendants.[9] And, unlike *McDole*, Sagely is not arguing that all categories of civil litigants and all criminal litigants are similarly situated. Instead, Sagely contends that felons and the subset of civil litigants who have been involuntarily committed are similarly situated in this context. And this court's precedent suggests Sagely is right when the issue

---

[7]*Id.* § 5-73-103.

[8]339 Ark. 391, 6 S.W.3d 74 (1999).

[9]*Id.* at 400, 6 S.W.3d at 80.

involves constitutional protections and the court process.[10]

This court has explained that civil litigants in an involuntary mental-commitment proceeding and criminal litigants facing potential incarceration are in a virtually identical situation.[11] As we have held regarding the involuntary commitment process, "there [is] no material distinction between procedures aimed at the curtailment of physical liberty whether criminal or civil."[12] This is why the Sixth and Fourteenth Amendments' safeguards have been extended to civil commitments.[13] Context matters. How can this court hold that civil and criminal litigants are similarly situated for purposes of the due process clause of the Fourteenth Amendment but not the equal protection clause of that same amendment? We can't. I would find Sagely and others involuntarily committed are similarly situated to felons for the Fourteenth Amendment's equal protection clause.

Additionally, these two groups are similarly situated with respect to the challenged statute and its governmental purpose. Even the State argued that equal protection "requires that the classification rest on real differences; that the distinction have some relevance to the purpose for which the classification is made . . . ."[14] Legislative purpose is the basis for understanding legislative classifications:

> [C]lassifications are not tested by whether or not the individuals are truly different
> in some absolute sense from those who receive different treatment . . . . Usually

---

[10]*Honor v. Yamuchi*, 307 Ark. 324, 327, 820 S.W.2d 267, 269 (1991).

[11]*Id.*

[12]*Id.*

[13]*See generally Addington v. Texas*, 441 U.S. 418 (1979).

[14]RP 340–41. The State continues to argue that the classification only needs to be rational and not arbitrary, but as discussed below, the Supreme Court has rejected that view.

21

one must look to the end or purpose of the legislation in order to determine whether persons are similarly situated in terms of that governmental system.[15]

The State's purpose of prohibiting those with a past involuntarily commitment from owning and possessing firearms is to advance public safety. The State's purpose is the same for prohibiting felons from owning and possessing firearms once convicted. Thus, both groups are restricted statutorily for the same reason. Indeed, we need look no further than the contested statute itself to see that the General Assembly grouped these classes of persons together to remove their rights.[16] As a matter of the statute's structure, each group loses its right to bear firearms upon initial adjudication/involuntary commitment/conviction. Additionally, the Supreme Court of the United States, as well as others, groups these two classes of individuals together when discussing firearm regulations.[17] For the many reasons stated, I find the groups similarly situated.

## II. *Treated Differently*

Did Sagely demonstrate that these similarly situated groups are treated differently? Yes. The State does not contest this.[18] Arkansas law does not provide a path for the

---

[15]3 Ronald D. Rotunda & John E. Nowak, Rotunda and Nowak's Treatise on Constitutional Law-Substance and Procedure § 18.2(a) (5th ed. 2023).

[16]Ark. Code Ann. § 5-73-103.

[17]*See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008) (jointly mentioning prohibitions on the "possession of firearms by felons and the mentally ill"); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*); *United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) (discussing together the mentally ill and felons as people who were historically stripped of their Second Amendment rights); *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019) (quoting *Heller*); *Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir. 2019) (discussing criminals and the mentally ill together as potentially proper subjects for disarmament).

[18]The State argues Sagely could obtain relief through 18 U.S.C. § 925(c). Yet we know from *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016), and similar

involuntarily committed to regain the right to own or possess a firearm, no matter how brief the commitment. Contrast this with multiple avenues that the State provides for felons to have their firearm prohibition rights restored.[19] In effect, an involuntary commitment to a mental institution for any purpose or duration is the equivalent of a permanent ban on the ownership or possession of a firearm in Arkansas. I find that felons and those who have been involuntarily committed are similarly situated groups who are treated unequally under section 5-73-103.

### III. *Fundamental Right*

The next step in the equal-protection analysis is to determine the appropriate standard for evaluating whether the State's differing treatment of these similarly situated groups is constitutional. Equal-protection analysis requires that we assess the State action under strict scrutiny, intermediate scrutiny, or the rational-basis test.[20] We use strict scrutiny if the classification interferes with the exercise of a fundamental right.[21]

The Second Amendment states that "the right of the people to keep and bear Arms, shall not be infringed."[22] The right to bear arms is fundamental.[23] In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court explained that

---

cases that Congress defunded 18 U.S.C. § 925(c) in 1992.

[19]Ark. Code Ann. § 5-73-103(b)(2)–(3), (d)–(e) (setting out multiple paths for regaining right to carry a firearm after a felony conviction).

[20]*United States v. Virginia*, 518 U.S. 515, 567 (1996).

[21]*Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).

[22]U.S. Const. amend. 2.

[23]*McDonald*, 561 U.S. at 778 (stating "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *Heller*, 554 U.S. at 592–94.

"[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

. . . .

. . . Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.[24]

The text of Arkansas Code Annotated section 5-73-103 implicates Sagely's Second Amendment rights. But the State contends Sagely no longer has a fundamental Second Amendment right after his involuntary commitment and the court should only apply the rational basis test.[25]

Under *Bruen*, the burden shifts to the State to show that the statute is consistent with a clear national historical tradition of firearm regulation dating back to the ratification of the Second Amendment.[26] To prevail, the State would have to show a clear national historical

---

[24]*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 2, 24 (2022).

[25]Although there is no Second Amendment claim, we must analyze the statute under the Second Amendment to determine the appropriate level of scrutiny under equal protection. This seems particularly odd given that *Bruen* eliminated means-end scrutiny in the Second Amendment context. It is important to keep these analyses separate, and understand that, in effect, the Second Amendment analysis is nested within the equal-protection claim like Russian nesting dolls—separate and wholly contained within it.

[26]*Bruen*, 597 U.S. at 2. The U.S. Supreme Court in *Heller* stated that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful regulatory measures[.]" *Heller*, 554 U.S. at 626–27. The majority believes this one-sentence dicta should end the inquiry. I disagree and believe the Sixth Circuit and Seventh Circuits are correct that *Heller* "did not invite courts into an analytical off-ramp to avoid constitutional analysis." *Tyler*, 837 F.3d at 686-688. *See also U.S. v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("*Heller* referred to felon disarmament bans only as "presumptively lawful," which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.). Indeed, Justice Scalia in *Heller* anticipated further examination of this presumption, stating that "there will be enough time to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." Possession of firearms by felons and the mentally ill were not before the court in *Heller*, *McDonald*, or *Bruen*. Finally, I believe the majority's

tradition that those involuntarily committed for any length or reason, *permanently* lost their fundamental firearm rights. I find the State did not meet this burden. Sagely, and others in his grouping, retains his fundamental right, even if historically the government could temporarily restrict those rights.

Yes, historical research shows a tradition in our country to disarm dangerous people.[27] This tradition is undisputed, and it is the prevailing view post-*Bruen* that nearly all founding-era traditions of disarmament related to dangerousness.[28] The founding-era historical research that supports disarming the mentally ill draws inferences from the ability of justices of the peace to "lock up" the mentally ill who were too "dangerous to be permitted to go abroad."[29]

---

approach contradicts *Bruen*'s directive to perform historical research and analysis to determine whether these restrictions are in fact consistent with the nation's history and tradition of firearm regulation. As *Heller*, *McDonald*, *Bruen*, and other cases make plain, the right to bear arms is important and fundamental enough to Arkansans and Americans that a regulation depriving any citizen of that right should receive the full measure of our scrutiny.

[27]"History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting), a*brogated by Bruen*, 597 U.S. at 1. Then-Judge Barrett continued, "[a]bsent evidence that he either belongs to a dangerous category or bears individual marks of risk, *permanently disqualifying* Kanter from possessing a gun violates the Second Amendment." *Id.* (emphasis added).

[28]Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 2-6 (2023); *see also id.* at 73 ("[T]he laws from the colonial and founding eras addressing the possession of arms by nonviolent offenders never forbade arms possession and often expressly protected or even required arms possession.").

[29]Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1378 (2009) ("The strongest originalist argument for the exception for the mentally ill rests on the traditional ability of justices of the peace to confine individuals with dangerous mental impairments."). Because these persons' liberty was restricted, some infer that it was permissible to restrict other rights such as owning and possessing a firearm. Yet researchers haven't produced eighteenth-century laws specifically excluding the mentally ill from firearms ownership. *See id.* at 1376.

But again, we must separate what this case is about. On appeal, it is not whether the State could or should restrict Sagely's ability to possess a firearm at the time of and during his involuntary commitment (and maybe even for some period after). His challenge is to the unequal treatment regarding the *permanency* of the restriction compared to those similarly situated. Under *Bruen*, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."[30]

There is historical evidence that some groups, initially disarmed for reasons of dangerousness, had their firearm rights restored. One historical examination points to colonial-era laws disarming "disaffected persons" (i.e., political and religious minorities) that also allowed restoration of firearm rights if those individuals swore loyalty to the king or otherwise rejoined the political community such that they were no longer perceived to be dangerous.[31] This research also points to Massachusetts' response to Shay's Rebellion in 1786, which subjected rebels to a "three-year prohibition on bearing arms," not a permanent one.[32] Also, intoxicated people were traditionally prohibited from carrying firearms while drunk, but they were not permanently banned from possessing or carrying firearms when sober.[33] But there does not appear to be any clear evidence that it was the

---

[30]*Bruen*, 597 U.S. at 29 (cleaned up).

[31]Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 268–69 (2020).

[32]*Id.*

[33]*See Daniels*, 77 F.4th at 345–46 (reviewing historical restrictions on firearm possession or use by intoxicated persons); *see also* Brief of Amicus Curiae Scholars of Second Amendment Law and The Independence Institute in Support of Defendant-Appellant, *United States v. Daniels*, 2023 WL 4447904 (5th Cir. 2023).

historical tradition to *permanently* disarm such persons when not locked up for mental illness or otherwise perceived still to be presently and immediately dangerous.[34]

Given that the State provides no historical reference in which one permanently lost his or her fundamental right to bear arms for a temporary mental commitment, I would find Sagely retained his fundamental right, and strict scrutiny applies. Thus, we must apply strict scrutiny to Arkansas Code Annotated section 5-73-103 and its unequal treatment of Sagely and other formerly involuntarily committed individuals as compared to felons.

## IV.  *Strict Scrutiny*

When the State enacts legislation that treats similarly situated individuals differently with respect to their exercise of a fundamental right, the State is required to "demonstrate that its classification has been precisely tailored to serve a compelling governmental interest."[35] This requirement is known as strict scrutiny. Yes, the State has a compelling governmental interest in public safety and the protection of individuals. The State, however, did not demonstrate that the permanent ban on firearm possession with no means of restoration for anyone who has been involuntarily committed to a mental-health treatment facility is narrowly tailored to serve the governmental interest.

An important shared characteristic of both groups (felons and those previously involuntarily committed) with respect to the law is that each contains subgroups of

---

[34] *See also Tyler*, 837 F.3d at 689 (finding, pre-*Bruen*, that "the historical evidence cited by *Heller* and the government does not directly support the proposition that persons who were once committed due to mental illness are forever ineligible to regain their second amendment rights"). I use the term mentally ill throughout, although historically the term used was "lunacy" or referred to individuals as "lunatics".

[35] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

27

individuals who are either more dangerous or less dangerous. In creating pathways to restore rights for felons, the legislature has acknowledged that not all felonies are the same, and so not all felons are too dangerous to own or possess firearms. For example, it carved out some business-related felonies for automatic lifting of the firearm ban upon completion of the sentence.[36] Likewise, individuals who have been involuntarily committed are not a monolith. Just as someone convicted of a felony securities violation ten years ago does not necessarily pose a special danger to the public today, someone who, twenty-eight years ago, was involuntarily committed for thirty days for depression following a painful divorce,[37] does not necessarily pose a special danger today either. Yet there are violent felons as well as individuals who retain severe mental illnesses that similarly the State would have an interest in continuing the firearm prohibition. But once the State carved out a legal path for felons, the State could not constitutionally ignore those like Sagely who were previously involuntarily committed.

The State's blanket prohibition with no path to restoration for anyone involuntarily committed, while providing multiple paths for restoration of rights to felons, requires a finding that Arkansas Code Annotated section 5-73-103 is not narrowly tailored to achieve the governmental interest and violates the Equal Protection Clause.

The failure to provide two similarly situated classes of citizens equal access to a means of redressing their common legal disability should give us special pause given the history of

---

[36] Ark. Code Ann. § 5-73-103(e).

[37] *See Tyler*, 837 F.3d at 683–84 (holding that a permanent federal firearms ban was unconstitutional as applied to a man who had been involuntarily committed for thirty days for depression during his divorce twenty-eight years earlier); *see also id*. at 686–87 ("Prior involuntary commitment is not coextensive with current mental illness[.]").

the Equal Protection Clause. The equal "protection of the laws" was historically understood to impose an affirmative duty on the State to enact laws that provide individuals with "equal access to the remedial processes of the courts[.]"[38] Thaddeus Stevens argued before the Thirty-Ninth Congress in 1866 that equal protection meant "[w]hatever means of redress is afforded to one shall be afforded to all."[39] Representative John Mann's arguments for Pennsylvania's ratification in 1867 spoke to both the importance of equality in application of the law and also before the courts:

> Its adoption will prohibit any judge in any State from looking at wealth or poverty. The intelligence or ignorance, the condition and surroundings, or even the color of skin, of any person coming before him.[40]

Equal protection of the laws does not guarantee a favorable outcome to any particular individual seeking redress of a perceived grievance, but it does require that similarly situated individuals have the same opportunity to access justice and legal review. Sagely may or may not be entitled to restoration of his firearm rights, but it is difficult in the historical context of the Equal Protection clause to ignore his plea for the opportunity for redress and to have his argument for restoration heard in a manner like that in which the State decided to afford similarly-situated felons.

---

[38]Randy E. Barnett & Evan D. Bernick, *The Original Meaning of the Fourteenth Amendment: Its Letter & Spirit*, 320–21, 333–34 (2021); *see also Barbier*, 113 U.S. at 31 ("The fourteenth amendment . . . undoubtedly intended . . . that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; . . . that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs . . . .").

[39]Barnett & Bernick *supra* note 40, at 330 (quoting Cong. Globe, 39th Cong., 1st sess., 2542 (1866)).

[40]*Id.* at 333.

As I would find in favor of Sagely's equal-protection claim, I would reverse and remand for entry of an order declaring the statute invalid. However, because Sagely is seeking a process, I would stay the order for 120 days to give the General Assembly an opportunity to create the process.[41] If they do not choose to create a process, the order would become effective.[42]

HILAND, J., joins.

**SHAWN A. WOMACK, Justice, dissenting.** Article 5, section 20 of the Arkansas Constitution states, "The State of Arkansas shall never be made defendant in any of her courts." Absent a clear constitutional exception to the contrary, Arkansas courts lack jurisdiction to hear a case in which the State is a defendant. Once litigation proceeds against an immune defendant, the defendant loses this protection, regardless of the outcome. Because this court lacks jurisdiction, we cannot move beyond the threshold issue that the State's immunity applies to Sagely's claim. Therefore, I would not address the merits.

*Smith, Cohen & Horan, PLC*, by: *Matthew T. Horan*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Carl F. "Trey" Cooper III*, Sr. Ass't Att'y Gen., for appellees.

---

[41]This court has stayed orders to allow the General Assembly to act. *See Lake View Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee*, 351 Ark. 31, 96–97, 91 S.W.3d 472, 510–11 (2002), supplemented, 358 Ark. 137, 189 S.W.3d 1 (2004). Other courts have acted similarly. *See generally, United States v. Askari*, 151 F.3d 131, 132 (3d Cir. 1988); *Galioto v. U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms*, 602 F. Supp. 682, 691 (D.N.J. 1985), *vacated sub nom U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms v. Galioto*, 477 U.S. 556, 106 S. Ct. 2683 (1986) (staying order to allow Congress to act to create avenue for former mental patients to have their rights restored but it was later vacated once Congress in fact acted.).

[42]The plurality objects to following past precedent, such as *Lakeview*, and giving the General Assembly time to act. The General Assembly is beginning a fiscal session in roughly a month and has a mechanism to add other matters if it deems appropriate. This policy matter should be placed in their hands and is a more prudent step given the gravity.